2023 IL App (1st) 210777-U

SECOND DIVISION
March 31, 2023

No. 1-21-0777

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 03 CR 24859 |
| JEREMIAH T. LEE, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Carl B. Boyd, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Ellis and Cobbs concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Appointed postconviction counsel rendered unreasonable assistance (Ill. S. Ct. 651(c) (eff. July 1, 2017)) by failing to amend the *pro se* petition to include an allegation of ineffective assistance of appellate counsel to avoid dismissal of the petition on the basis of waiver. The matter is reversed and remanded for new second-stage proceedings and the appointment of new postconviction counsel.

¶ 2    After a jury trial in the circuit court of Cook County, the petitioner, Jeremiah T. Lee, was

convicted of home invasion (720 ILCS 5/12-11(a)(3) (West 2002)) and sentenced to 25 years' imprisonment. After the petitioner filed a *pro se* petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2008)), the petition was automatically advanced to the second stage of postconviction proceedings, and the circuit court appointed counsel to represent him. After appointed counsel filed a certificate pursuant to Rule 651(c) (Ill. S. Ct. 651(c) (eff. July 1, 2017)) stating that he would not amend the *pro se* petition, the State filed a motion to dismiss arguing that the issues raised in the petition were waived because they were not addressed on direct appeal. The circuit court agreed and granted the State's motion. The petitioner now appeals contending that his postconviction counsel failed to provide a reasonable level of assistance as required under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) by failing to amend his *pro se* petition to include an allegation of ineffective assistance of appellate counsel so as to circumvent waiver. The petitioner requests that we reverse the dismissal of his *pro se* petition and remand for further second-stage proceedings with the appointment of new and competent postconviction counsel. For the following reasons, we reverse and remand with directions.

¶ 3                                   I. BACKGROUND

¶ 4     The record before us reveals the following relevant facts and procedural history. In November 2003, the petitioner was charged with, *inter alia*, numerous counts of armed robbery, aggravated battery, and home invasion for his involvement in the October 19, 2003, attack on two victims, Horace Timms (Horace) and Eric Timms (Eric), at their home. The petitioner proceeded with a jury trial at which the following evidence was adduced.

¶ 5     One of the victims, Eric, testified that in the early morning hours of October 19, 2003, he returned home from a date with his girlfriend, Tashuanda Clayton, and parked his car in the driveway. Eric then exited his car to retrieve a handgun that he kept hidden in a nearby flowerpot

before manually lifting his garage door open. He then returned to his vehicle and drove it into the garage. Eric explained that he performed this ritual when he returned home because of a previous "car-jacking."

¶ 6    Eric stated that as he pulled into his garage, the petitioner appeared next to him, and another individual appeared next to Tashuanda. Both men brandished their handguns and demanded that Eric and Tashuanda exit their car. Eric described the petitioner as "black and ugly" and the codefendant as "skinny and light-skinned." He testified that he was able to view the petitioner "several" times as there was a "shop light" on in the garage.

¶ 7    After complying with the petitioner's request to exit the car, Eric and Tashuanda were ordered to lie on the ground and give the offenders their money and jewelry. While removing Eric's money, the petitioner noticed Eric's handgun, took it from him and struck Eric in the head. Eric then told the petitioner that he had an additional $15,000 in his father's room inside the house. Eric explained that he said this because he wanted to "get them both apart," believing that he could "handle one." The petitioner then put a gun to the back of Eric's head and ordered him into the house to retrieve the additional money.

¶ 8    After climbing the stairs, Eric turned on a hallway light, and near his father's bedroom, attempted to gain control of the petitioner's handgun. During the struggle, the petitioner fired the weapon into the room where Eric's father, Horace, was sleeping. When he saw that the petitioner had shot his father, Eric grabbed at the petitioner's handgun and succeeded in wrestling it out of his hand.

¶ 9    Eric testified that although Horace was struck with a bullet in his back and arm, he joined the struggle and tried to secure the petitioner, but the petitioner escaped from his grasp. While the petitioner was running away, Eric shot at him. The petitioner hit his head on a mirror at the end of

3

the hallway and escaped.

¶ 10   Eric testified that in the next several days he identified the petitioner from a photo array and later from a line-up as the person who attacked him.

¶ 11   On cross-examination, Eric acknowledged that the police took "samples" from the mirror where the petitioner hit his head, even though there was no visible blood there.

¶ 12   Eric's father, Horace, next testified that on the night in question he was asleep in his bed when he heard a loud gunshot from inside his bedroom and felt numbness underneath his arm. Horace stumbled out of his bed and walked towards "shadows" that were "tussling" in the room. He joined the fight and tried to grab the offender, whom he could not see because it was "pitch dark" in the room with only some light coming in from the hallway. According to Horace, Eric was standing behind him, when the offender escaped from Horace's grasp and ran out into the hallway. Eric then shot at the offender, but the offender just "banged" his head against the hallway mirror and ran down the stairs. Horace testified that when the ambulance arrived, he was taken to the hospital where he was treated for gunshot wounds to his back and arm.

¶ 13   Tashuanda next testified consistently with Eric. She added that after the offenders took Eric into the house to get the money, she remained on the garage floor until she was certain that she was alone. She then stood up and called the police. Tashuanda further averred that while in the garage, she heard one gunshot, followed by additional gunshots and running footsteps from inside the house. Tashuanda was unable to identify either offender because she kept her head to the ground and her eyes closed the entire time the perpetrators were inside the garage, as instructed by the offender who approached her side of the vehicle.

¶ 14   Markham Police Detective Mike White next testified that at about 2:30 a.m. on October 19, 2003, he was assigned to investigate the home invasion and shooting that took place at Eric's

home. Once at the scene, Detective White first spoke with Eric, who described what happened to him. After his conversation with Eric, Detective White notified nearby hospitals to be on the lookout for possible gunshot victims as Eric had told him that he may have shot the petitioner.

¶ 15    At about 8 a.m. that same morning, Detective White received notification of a possible victim from one of the local hospitals. The victim was identified as the petitioner. Detective White requested that a photo of the petitioner be sent to him from the hospital and then placed that photograph in a photo array. Detective White then showed that photo array to Eric, who identified the petitioner as his attacker.

¶ 16    Detective White also testified that while at the crime scene, he recovered a revolver and shell casings from the bedroom and the hallway of Eric's home. In addition, he took several swabs from inside the house. Specifically, he took swabs from the rear door and the floor right next to the door because he observed dried blood on them. In addition, he took "a swab and scraped it along the [hallway] mirror" on the second floor "in the event there was some DNA evidence that would match with [the petitioner's] because there was a cracked corner" there. Detective White admitted that he did not observe any blood on the mirror.

¶ 17    On cross-examination, defense counsel unsuccessfully attempted to elicit information from Detective White regarding the results of the DNA tests performed on those three swabs. After the State's objections were sustained, the jury was excused, and the parties argued the issue before the trial judge. The State offered to stipulate that the DNA results revealed that both blood samples recovered from the scene did not come from the petitioner, but rather from the victim, Horace, but defense counsel rejected that stipulation.

¶ 18    Illinois State Police Crime Laboratory expert forensic biologist, William Anselme, was next called as a witness for the State. He testified that on March 3, 2004, he received three swabs

with seals, which were collected from various locations at the crime scene. Anselme testified that the swabs marked "rear door" and "off floor," indicated the presence of blood and that the swab marked "off mirror" did not.

¶ 19    On cross-examination, Anselme was asked whether he was able to determine whose blood was indicated on the two swabs, and he responded that he did not perform any tests for that purpose and that the swabs were sent to an independent lab for DNA testing.

¶ 20    No testimony was offered by either party at trial as to the results of that DNA testing.[1]

¶ 21    Nurse Doug Foglietta next testified that he treated the petitioner in the emergency room of St. James Hospital in Olympia Fields, on the morning of the offense. The petitioner told Foglietta that he was robbed and had been shot. Foglietta testified, however, that the petitioner had no gunshot wounds on his body and only sustained a laceration to his right eyelid.

¶ 22    After the State rested, the petitioner presented an alibi defense, offering the testimony of three witnesses. First, the petitioner himself testified that in 2003 he lived in Matteson, Illinois. On the morning of October 18, 2003, the petitioner's friend, John Hopkins, picked him up and brought him to a barbeque in Justice, Illinois, where they stayed until about 9 p.m. Afterwards, at about 11 p.m., they picked up another friend, Parnell Williams, from Chicago. While they were with Williams, Hopkins received a telephone call from another friend, Billy Grindle, Jr., after which they drove to Northern Illinois University to party. According to the petitioner, there were many events on campus that night, including a Ludicrous concert, and fraternity and Sweetest Day parties.

¶ 23    The petitioner averred that they arrived in DeKalb, Illinois at about 1 a.m., and met with a group of friends, which included Grindle. After trying to get tickets to the Ludicrous concert they

---

[1] As shall be more fully explained below, these DNA results were available at the time of the petitioner's trial.

realized it had already finished and instead "hung out" with some girls in front of the concert venue. After being invited to a fraternity party, they followed the girls to the parking lot of the fraternity house where they continued to party for about three hours. Somewhere between 2 and 3 a.m., while in that parking lot, the petitioner began talking to a girl. According to the petitioner, this upset another man who was present, because he had attempted to talk to the same girl. The petitioner and the man then "exchanged words" and threw "a couple of punches," which resulted in injuries to the petitioner's nose and his right eye. Although the petitioner considered his injuries to be serious, he waited until he returned home to Matteson before going to the hospital. The petitioner explained that he did not seek medical treatment in DeKalb because he was on parole and feared that he would be reported for a parole violation for leaving Cook county.

¶ 24     On cross-examination, the petitioner admitted that he did not tell his treating nurse at St. James Hospital that he sustained his injuries during a fight in DeKalb. In addition, he acknowledged that he never told the police that he was in such a fight. The petitioner, however, denied stating that he was robbed and shot.

¶ 25     Two of the petitioner's friends, John Hopkins and Billy Grindle, Jr., both testified consistently with the petitioner. They stated that they were with the petitioner in DeKalb on the night of the shooting and that they were present during the fight in which he sustained his injuries. Hopkins and Grindle both also professed the petitioner's innocence.

¶ 26     Hopkins further stated that when, on October 20, 2003, he learned from the petitioner's mother that the petitioner had been arrested for a shooting in Markham, he went to the police station with her to speak to the police. Hopkins averred that when he told the police officer at the station what he knew, he was told to wait, but that no one came out to speak with him.

¶ 27     On cross-examination, Hopkins admitted that after an hour, he left the police station and

7

did not speak to anyone until the petitioner's trial. On cross-examination, Gridle similarly admitted that he did not speak to anyone about the incident in DeKalb until the instant trial. Both, however, averred that they have been in court with the petitioner's mother since the beginning of the proceedings against the petitioner.

¶ 28    After the defense rested, in rebuttal, the State called Matteson Police Officer Brown, who testified that he interviewed the petitioner at St. James Hospital in Olympia Fields at 7:30 a.m. on October 19, 2003. According to Officer Brown, at that time, the petitioner reported to him that he was a victim of a robbery and that he had been shot.

¶ 29    After the defense rested, the parties proceed with closing arguments. The trial judge then instructed the jury with, *inter alia*, two separate instructions for home invasion, one including Horace and the other Eric, as victims.

¶ 30    After deliberations, the jury found the petitioner guilty on only one count of home invasion against Horace, but not guilty on all other counts, including home invasion against Eric.

¶ 31    After the circuit court denied the petitioner's motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, the parties proceeded with sentencing. After hearing evidence in aggravation and mitigation, the circuit court sentenced the petitioner to 25 years' imprisonment.

¶ 32    On appeal, the petitioner argued that: (1) he was erroneously charged with two counts of home invasion; (2) the jury returned inconsistent verdicts; and (3) he was not proven guilty beyond a reasonable doubt. See *People v. Lee*, No. 1-05-0707 (June 8, 2006) (unpublished order pursuant to Illinois Supreme Court Rule 23). On June 8, 2008, this court affirmed his conviction.

¶ 33    On February 25, 2008, the petitioner filed the instant *pro se* postconviction petition, which

8

alleged in its entirety:

> "The court abused its discretion and by doing so they denied me effective assistance of counsel. By not allowing my lawyer to properly defend me. The sole issue at trial was identity and I was not allowed to present the evidence that showed my innocence. The State made false arguments and allowed State witness Mike White to only answer questions about blood and evidence that appeared to make me look guilty. Had the jury been allowed to hear that none of my DNA was ever found on the rear door or mirror. [*sic*] The outcome of the trial would have been different."

In support of his petition, the petitioner attached a report from the Joliet Forensic Science Laboratory indicating that a buccal swab was taken from the petitioner and compared to the male profile identified in the swabs of blood taken from the rear door and mirror of the victims' home, and that the DNA profile did not match the petitioner.[2]

¶ 34 On May 6, 2011, the postconviction court advanced the *pro se* petition to the second stage of postconviction proceedings because it had not been ruled upon within 90 days. On June 11, 2011, the court appointed the Officer of the Public Defender to represent the petitioner. For the next ten years, the petitioner was represented by three different attorneys from that office.

¶ 35 First, on July 22, 2011, Assistant Public Defender (APD) Jeffrey Walker appeared on the petitioner's behalf. On July 20, 2012, APD Walker stated that he had received the record in the

---

[2] As shall be more fully elaborated below, our review of the Joliet Forensic Science Laboratory (Joliet Laboratory) Report completed prior to the petitioner's trial, reveals that the report inaccurately, or in the very least, inconsistently, reflects the items that were tested against the petitioner's DNA, and which excluded the presence of his blood at the scene of the crime. The report concludes that DNA testing performed on the swabs taken from the "rear door" (Exhibit 5A1) and the "mirror" (Exhibit 5B1) reveals identical male DNA, which does not match that of the petitioner. However, a subsequent page differently identifies the swabs sent to the laboratory for DNA testing. Namely Exhibit 5A is identified as a swab taken "off rear door," while Exhibit 5B is identified as a swab taken "off floor." The report next identifies Exhibit 5C as a swab taken "off mirror." The report further indicates that blood was present only in Exhibits 5A and 5B (the rear door and the floor, but not on the mirror). Thus, it is unclear which items (the floor or the mirror) were tested for DNA prior to trial and excluded the presence of the petitioner's blood at the crime scene.

case and was "going to engage in some investigation concerning several witnesses in this matter." For the next three years the case was continued so that postconviction counsel could obtain the trial file, conduct his investigation, and interview witnesses. On January 16, 2015, APD Walker filed a section 116-3 motion (725 ILCS 5/116-3 (West 2014))) for DNA and fingerprint testing. According to that motion, the DNA from the blood recovered from the rear door and the floor of Eric's home excluded the petitioner, but there was no evidence about who it belonged to.[3] The motion therefore sought to have those two swabs tested against the State's DNA database. In addition, the motion sought fingerprint testing of the firearm recovered from the scene of the crime that Eric allegedly took from the petitioner. The case was then continued and turned over to the State's DNA Unit.

¶ 36    On June 5, 2015, APD Walker appeared in court and indicated that after speaking with attorneys from the State's DNA Unit "concerning a couple of issues" regarding "both the DNA and fingerprint testing" he did not think there was anything more the State could do "as far as the forensic part was concerned." When asked by the State, whether he was withdrawing his motion for forensic testing, APD Walker first indicated that he was not, but that "based on [their] conversation we kind of alleviated all the concerns that it would raise. So, it's kind of moot at this point." The State then requested that the motion be withdrawn procedurally, and APD Walker agreed, stating: "No problem. We resolved the issues that were raised in the motion." After withdrawing his section 116-3 motion for DNA testing, APD Walker stated that he needed to do "some more investigation" "outside of the forensic testing part" and requested another

---

[3] We note that APD Walker's representations regarding what was tested contradict the DNA results completed by the Joliet Laboratory, which, as already noted above, state that DNA from the blood collected on the rear door and *mirror* were tested and excluded the petitioner.

continuance.

¶ 37    Following several more continuances, however, on February 17, 2017, the State informed the court that APD Walker had passed away and that the case needed to be reassigned. On June 2, 2017, the petitioner's newly appointed postconviction counsel APD Mary Duchatellier appeared in court. On September 22, 2017, APD Duchatellier asked for a continuance to refile the motion for forensic testing, indicating that her file "shows that there was an issue with respect to fingerprints on a door and DNA on a mirror." On June 15, 2018, APD Duchatellier filed a new section 116-3 motion (725 ILCS 5/116-3 (West 2016)) requesting the same DNA and fingerprint testing originally sought by APD Walker.

¶ 38    On September 14, 2018, the State filed a motion to dismiss the petitioner's request for DNA testing, indicating that the testing had already been completed. According to the State's motion to dismiss the results of that testing showed that the DNA recovered from the blood on the rear door and floor of the victims' home matched Horace, while the revolver recovered from the scene of the crime contained no latent fingerprints suitable for testing. The State then tendered copies of these reports, which were completed by the Joliet Forensic Laboratory prior to trial, to the court and to postconviction counsel.[4] After APD Duchatellier requested time to review the reports and speak with her client, the court granted the State's motion to strike the petitioner's section 116-3 motion for DNA testing and continued the case.

¶ 39    On March 22, 2019, APD Duchatellier informed the court that there was a "forensic issue" in that "the State is saying that there was a mirror that there was no blood found on, and my client is challenging that." APD Duchatellier then sought a continuance so that the Forensics Unit of the Public Defender's Office could look at the case. She also informed the court that the Unit was

---

[4] Again, the State's position contradicts the results of the DNA results contained in the reports from the Joliet Laboratory.

"kind of backed up."

¶ 40     On November 8, 2019, another new postconviction counsel, APD Frank Adams, appeared on behalf of the petitioner because APD Duchatellier had retired. APD Frank filed a supplemental section 116-3 motion (725 ILCS 5/116-3 (West 2018)) seeking, *inter alia*, that DNA testing be performed on the swab taken from the mirror inside of the victim's home. The State requested, and was given time, to review the supplemental motion and to file its response. On July 13, 2021, the State informed the court that it would agree solely to the testing of an additional "ear swab" that had been found at the scene of the crime and that had not been previously tested. APD Adams then stated:

> "We have no objection to the agreed order that I just reviewed that the State sent me. And it is our position that the DNA testing might corroborate the –defense's theory at trial because there was no DNA – there was no DNA testing of the swab that was taken from a mirror. And this testing is necessary to corroborate our theory at trial and discredit the eyewitness testimony."

The circuit court then entered an agreed order to the testing of the DNA swab collected from the mirror.[5]

¶ 41     On February 23, 2021, APD Adams filed a Rule 651(c) certificate, declaring that he had consulted with the petitioner to ascertain his contentions of constitutional deprivations, obtained the record on appeal, conducted further investigations, and was not going to file an amended or supplemental petition because "the petitioner's previously filed *pro se* petition for postconviction relief adequately sets forth the petitioner's claims of petitioner's deprivation of his constitutional

---

[5] It appears from this order that the parties eventually agreed that contrary to the reports from the Joliet Laboratory, the swab collected from the mirror was never tested for DNA and that the swabs of blood previously tested, which excluded the petitioner's presence form the crime scene, were from the floor and the rear door.

rights."

¶ 42    At this same hearing, the State informed the court that the DNA testing was completed and that the results were tendered to postconviction counsel and APD Adams acknowledged receipt of the test results. Those test results, however, are not part of the record on appeal, and we do not know what they reveal.

¶ 43    On March 3, 2021, the State filed a motion to dismiss the *pro se* petition. At the hearing on that motion, on June 21, 2021, the State first pointed out that the *pro se* petition was untimely because it was filed on either March 11, 2007, or February 25, 2008, and should have been filed by December 8, 2006. The State further argued that the issues raised by the petitioner (*i.e.*, that (1) the circuit court erred in allowing Detective White "to testify to only certain questions about blood evidence" and (2) that the jury did not hear evidence that the petitioner's DNA was not found on the rear door or mirror) were waived because they were not addressed on direct appeal. At this point in the proceedings, the circuit court reminded the State that the *pro se* petition had also raised a concise "one-liner" claim of ineffective assistance of trial counsel. The State responded that this issue was "not well-pleaded" and therefore should not be considered.

¶ 44    In response, APD Adams first addressed the timeliness issue and indicated that even though he "had done additional research, an additional investigation" he had "nothing additional to add." With respect to waiver, APD Adams argued that waiver could be excused where "fundamental fairness so required." In addition, as to the merits, counsel reminded the court that he had "done additional testing, additional investigation, additional research" and "although [he] d[idn]'t have anything additional to add on [the petitioner's] behalf *** there was an alibi defense and there were numerous witnesses indicating that the petitioner was in DeKalb at the time of the alleged

offense."

¶ 45 The circuit court granted the State's motion to dismiss, finding that all the issues raised by the *pro se* petition were waived. The petitioner now appeals.

¶ 46                                    II. ANALYSIS

¶ 47 On appeal, the petitioner solely contends that he was denied his right to reasonable assistance of postconviction counsel. For the following reasons, we agree.

¶ 48 At the outset, we note that the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2008)) provides a method for criminal defendants to challenge their convictions on the basis of a substantial denial of federal or state constitutional rights. *People v. Cotto*, 2016 IL 119006, ¶ 26; see also *People v. Tate*, 2012 IL 11214, ¶ 8; see also *People v. Hodges*, 234 Ill. 2d 1, 9 (2009); *People v. Peeples*, 205 Ill. 2d 480, 509 (2002). In noncapital cases, the Act provides a three-stage process. *Cotto*, 2016 IL 119006, ¶ 26; see also *People v. Johnson*, 2017 IL 120310, ¶ 14. At the first stage of the proceedings, within the first 90 days, the circuit court must independently review the petition and determine whether the allegations therein, taken as true, demonstrate a constitutional violation or whether they are frivolous or patently without merit. *Cotto*, 2016 IL 119006, ¶ 26; 725 ILCS 5/122–2.1(a)(2) (West 2008); *Tate*, 2012 IL 112214, ¶ 9. If the circuit court affirmatively determines that the petition is neither frivolous nor patently without merit or if it takes no action on the petition within 90 days after the petition is filed and docketed, the petition must be advanced to the second stage. *Cotto*, 2016 IL 119006, ¶ 26.

¶ 49 At the second stage of the proceedings, counsel may be appointed to represent an indigent defendant. 725 ILCS 5/122–2.1(a)(2), (b), 122-4, 122-5 (West 2008); *Cotto*, 2016 IL 119006, ¶ 27; *Tate*, 2012 IL 112214, ¶ 10; *People v. Brooks*, 221 Ill. 2d 381, 389 (2006). After appointed postconviction counsel amends the petition, if necessary, the State is allowed to file responsive

pleadings and may either answer or move to dismiss the petition. 725 ILCS 5/122-5 (West 2008); *People v. Pendelton*, 223 Ill. 2d 458, 472 (2006). The circuit court must then determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. 725 ILCS 5/122-6 (West 2008); *Tate*, 2012 IL 11214, ¶ 10; *Pendelton*, 223 Ill. 2d at 473. In doing so, the court must not engage in fact-finding or credibility determinations but must take as true all well-pleaded facts that are not positively rebutted by the original trial record. *People v. Domagala*, 2013 IL 11368, ¶ 35. If no substantial showing of a constitutional violation is made, the petition is dismissed. *Tate*, 2012 IL 11214, ¶ 10. If, however, a substantial showing of a constitutional violation is set forth, the petition must be advanced to the third stage for the circuit court to conduct an evidentiary hearing. *Tate*, 2012 IL 11214, ¶ 10.

¶ 50    The right to counsel at the second stage of postconviction proceedings is not guaranteed by either the state or federal constitutions; rather it is " 'a matter of legislative grace.' " *Cotto*, 2016 IL 119006, ¶ 28 (quoting *People v. Hardin*, 217 Ill. 2d 289, 299 (2005)). Accordingly, a petitioner is entitled only to the level of assistance provided for by the Act. *Cotto*, 2016 IL 119006, ¶ 28.

¶ 51    Our supreme court has repeatedly held that under the Act, petitioners are entitled only to a "reasonable" level of assistance. *Cotto*, 2016 IL 119006, ¶ 28. To assure this level of assistance, Supreme Court Rule 651(c) (Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013)) imposes three duties on postconviction counsel. *Cotto*, 2016 IL 119006, ¶ 28; see also *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). Pursuant to that rule, either the record or a certificate filed by the attorney, must show that counsel: (1) consulted with the petitioner to ascertain his contentions of constitutional deprivations; (2) examined the record of the trial proceedings; and (3) made any amendments to the filed *pro se* petition necessary for an adequate representation of the petitioner's contentions. See Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013); see also *Cotto*, 2016 IL 119006, ¶ 28; *Perkins*, 229 Ill.

2d at 42. A certificate pursuant to rule 651(c) (Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013)) creates a rebuttable presumption of compliance with that rule. *People v. Profit*, 2012 IL App (1st) 101397 ¶ 19. Where a certificate is filed, the petitioner bears the burden of overcoming this presumption by demonstrating his attorney's failure to substantially comply with the duties mandated by the rule. *Profit*, 2012 IL App (1st) 101307, ¶ 19. We review postconviction counsel's compliance with supreme court rules *de novo*. *Id.* ¶ 17.

¶ 52    In the present case, on appeal, the petitioner acknowledges that postconviction counsel filed a Rule 651(c) certificate. He nonetheless asserts that he was denied his statutory right to reasonable assistance when postconviction counsel failed to amend his *pro se* petition to include a claim of ineffective assistance of appellate counsel to avoid the procedural bar of waiver. According to the petitioner, his *pro se* petition alleged that his trial counsel was ineffective for failing to establish that none of his DNA was recovered from the blood collected at the scene of the crime. The petitioner contends that because this issue could have been addressed on direct appeal, postconviction counsel's failure to argue ineffective assistance of appellate counsel for failing to raise that issue resulted in dismissal of his claim on the basis of waiver and therefore constituted unreasonable assistance under the Act. The petitioner therefore seeks remand for a new second-stage proceeding with the appointment of competent counsel.

¶ 53    In response, the State argues that the petitioner has failed to rebut the presumption of reasonable representation created by postconviction counsel's filing of the Rule 651(c) certificate. In addition, the State asserts that because the petitioner did not "sufficiently plead" an ineffective assistance of trial counsel claim in his *pro se* petition, postconviction counsel would have had to add an entirely new claim, rather than simply amend the petition, to present the argument that the petitioner now raises on appeal. Lastly, the State points out that, in any event, the petitioner's claim

16

of ineffective assistance of trial counsel was meritless and therefore appellate counsel had no duty to raise it on direct appeal. The State therefore asserts that the petitioner cannot establish prejudice stemming from postconviction counsel's failure to amend the petition to raise the ineffective assistance of appellate counsel claim. For the following reasons, we disagree with the State.

¶ 54    Because most petitions under the Act are filed *pro se* by prisoners without any access to legal counsel, the purpose of Rule 651(c) is to ensure that postconviction counsel shapes the petitioner's claims into a proper legal form and presents them to the court. *Perkins*, 229 Ill. 2d at 44. Accordingly, Supreme Court Rule 651(c) requires the record on appeal to show that counsel made amendments to the *pro se* petition which were necessary for an adequate presentation of the petitioner's contentions. *People v. Johnson*, 154 Ill. 2d 227, 243 (1993); *People v. Turner*, 187 Ill. 2d 406, 412 (1999). Our supreme court has repeatedly held that the duty to adequately or properly present the petitioner's substantive claims "necessarily includes attempting to overcome procedural bars *** that will result in dismissal of a petition if not rebutted." *Perkins*, 229 Ill. 2d at 44; see also *Turner*, 187 Ill. 2d at 412; *Johnson*, 154 Ill. 2d at 243. Postconviction counsel must meet these procedural requirements in order to adequately present a constitutional claim under the Act. See *Turner*, 187 Ill. 2d at 412; *Johnson*, 154 Ill. 2d at 246; *Perkins*, 229 Ill. 2d at 44.

¶ 55    In the present case, the record rebuts the presumption of reasonable assistance created by postconviction counsel's filing of the Rule 651(c) certificate. The record affirmatively shows that the circuit court dismissed the *pro se* petition because the claims raised in that petition were "waived" since they could have, but were not, raised on direct appeal. However, waiver could have been avoided by a simple and routine amendment alleging ineffective assistance of appellate counsel. See *Turner*, 187 Ill. 2d at 414. Because postconviction counsel did not make this necessary amendment to the *pro se* postconviction petition, counsel did not provide reasonable

assistance to the petitioner. See *Turner*, 187 Ill. 2d at 414; *People v. Schlosser*, 2012 IL App (1st) 092523, ¶¶ 25-26.

¶ 56    In coming to this conclusion, we find the decisions in *Turner*, 187 Ill. 2d 406, and *Schlosser*, 2012 IL App (1st) 092523 to be directly on point.

¶ 57    In *Turner*, our supreme court held that Rule 651(c) requires postconviction counsel to amend a *pro se* petition to allege ineffective assistance of appellate counsel to avoid the procedural bar of waiver. *Turner*, 187 Ill. 2d at 412-14. In that case, after the petitioner filed a *pro se* postconviction petition, his postconviction counsel elected to stand on the *pro se* petition, and in, doing so, *inter alia*, failed to amend the petition to allege ineffective assistance of appellate counsel to avoid the bar of waiver, which triggered the circuit court's dismissal. *Id.* at 412-13. On appeal, our supreme court held that this failure by postconviction counsel constituted unreasonable representation under the Act. *Id.* at 413. The court noted "the ease with which a petitioner may evade the operation of waiver simply by arguing ineffective assistance of appellate counsel," and held that postconviction counsel's failure to file such a routine amendment prevented the trial court from considering the merits of the petitioner's claims. *Id.* In doing so, the court explicitly rejected the State's suggestion that because the petitioner's underlying claims lacked merit, postconviction counsel's failure to amend the petition did not prejudice the petitioner. *Id*. The court held that the prejudice to the petitioner was "palpable" because counsel's failure to amend the petition to "overcome the procedural bar of waiver" "precluded consideration of [the] petitioner's claims on the merits and directly contributed to the dismissal of the petition without an evidentiary hearing." *Id*. The court further refused to speculate as to whether the trial court would have dismissed the petition if counsel had adequately performed his duties under Rule 651(c). *Id*. at 416.

¶ 58    More recently, this appellate court in *Schlosser* reaffirmed the holding in *Turner* and found

that postconviction counsel renders unreasonable assistance under the Act when he fails to amend a *pro se* postconviction petition to allege ineffective assistance of appellate counsel to avoid waiver. *Schlosser*, 2012 IL App (1st) 092523, ¶ 26. In that case, the petitioner filed a *pro se* postconviction petition alleging that he had not been proven guilty beyond a reasonable doubt and that his sentence was unfair. *Id.* ¶ 2. After the circuit court advanced the petition to the second stage of postconviction proceedings, appointed counsel filed a Rule 651(c) certificate and stood on the *pro se* petition. *Id.* Although counsel did not amend the petition to include a claim of ineffective assistance of appellate counsel, at the hearing on the State's motion to dismiss, for the first time, counsel argued that appellate counsel was ineffective. *Id.* Despite counsel's arguments at the hearing, the circuit court dismissed the petition finding that the claims were waived. *Id.*

¶ 59 On appeal, this court held that postconviction counsel's failure to amend the *pro se* petition to allege ineffective assistance of appellate counsel, which could have "overcome the procedural bar of waiver" constituted unreasonable representation under the Act. *Id.* ¶ 26. In doing so, we reiterated that adequately presenting a *pro se* petitioner's claims pursuant to Rule 651(c) "necessarily includes attempting to overcome procedural bars *** that will result in the dismissal of the petition if not rebutted." *Id.* ¶ 21 (quoting *Perkins*, 229 Ill. 2d at 44). We held that counsel's failure to make this routine amendment "directly contributed" to the dismissal of the petition. *Id.* ¶ 24. Accordingly, we reversed and remanded for further second-stage proceedings. *Id.* ¶ 35.

¶ 60 In the present case, just as in *Turner* and *Schlosser*, the petitioner's claim regarding trial counsel's failure to introduce the results of DNA testing that would have established that his blood was never found at the scene of the crime could have been raised on direct appeal, as it was available at the time of the petitioner's trial. In fact, the petitioner attached the results of that DNA evidence obtained prior to trial to his *pro se* petition. Absent postconviction counsel's amendment

to the petition to allege ineffective assistance of appellate counsel, however, the issue was waived. Moreover, just as in *Schlosser*, here, postconviction counsel not only failed to make the requisite routine amendment that would have avoided waiver, but also certified that no amendments were necessary. Counsel then contradicted himself by arguing, for the first time at the hearing on the State's motion to dismiss, that waiver could be relaxed where "fundamental fairness so requires." Under this record, we are compelled to conclude that postconviction counsel's failure to routinely amend the petition to avoid waiver clearly demonstrates that he did not comply with the duties imposed by Rule 651(c). See *Schlosser*, 2012 IL App (1st) 092523, ¶ 32 ("Counsel cannot fulfill his Rule 651(c) duties simply by filing a certificate if he has not provided adequate assistance."). We therefore find that counsel provided unreasonable assistance under the Act and that this cause must be remanded for further second-stage proceedings and the appointment of new postconviction counsel. *Id*.

¶ 61    The State nonetheless asserts that postconviction counsel substantially complied with the requirements of Rule 651(c) because the petitioner never actually raised the issue of ineffective assistance of trial counsel in his *pro se* petition. As such, the State contends that postconviction counsel had no duty to amend the petition to include an allegation of ineffective assistance of appellate counsel to avoid waiver. We disagree.

¶ 62    Contrary to the State's position, the record below reveals that while not perfectly articulated, the *pro se* petition raised an ineffective assistance of trial counsel claim. The *pro se* petition explicitly alleged that the petitioner was "denied effective assistance of counsel" by the circuit court's rulings because "[t]he sole issue at trial was identity *** Had the jury been allowed to hear that none of my DNA was ever found on the rear door or mirror the outcome of the trial could have been different." In support, the petition attached the DNA report prepared prior to trial,

which indicated that the blood recovered from the scene was not the petitioner's. Because it was trial counsel's duty to present the results of the DNA evidence to the jury, and according to the petitioner, that evidence would have shown that none of the DNA recovered from the blood at the crime scene was his, the petition sufficiently, albeit inartfully, pleaded both defense counsel's ineffective representation and prejudice stemming from counsel's inactions. What is more, the record reveals that the circuit court itself believed that the *pro se* petition raised an ineffective assistance of trial counsel claim, as evidenced by its question to the State at the hearing on the State's motion to dismiss. The court specifically noted that the petitioner had raised a brief "one-liner" ineffective assistance of counsel claim and asked the State to respond to that issue. Under this record, and liberally construing the *pro se* petition, we reject the State's contention that the petitioner insufficiently pleaded ineffective assistance of trial counsel so as to have excused postconviction counsel from fulfilling his duties under Rule 651(c) and making a routine amendment that would have avoided waiver.

¶ 63    The State next argues that even if the *pro se* petition alleged ineffective assistance of trial counsel, because that claim has no merit, postconviction counsel had no duty to amend the petition to allege ineffective assistance of appellate counsel to avoid waiver. In this vein, the State contends that trial counsel sufficiently attempted to challenge the DNA evidence at the petitioner's trial and informed the jury in closing that no evidence was presented establishing that the petitioner's blood was found at the scene of the crime. The State then speculates that because postconviction counsel chose not to amend the petition, the new postconviction DNA results necessarily contradict the petitioner's contentions regarding what was found at the scene of the crime and therefore directly rebut the petitioner's claim of ineffective assistance of trial counsel. For the following reasons, we

disagree.

¶ 64    At the outset, we note that the State's arguments regarding the results of the postconviction DNA testing are at best disingenuous. First, because those results are not part of the record on appeal, we have no way of knowing what, if anything, they revealed about the DNA, if any was even present, on the mirror inside the victim's home. Any speculation regarding why postconviction counsel chose not to amend the petition after the receipt of these results is inappropriate at this stage of the proceedings. What is more, the results of the new DNA testing have absolutely no bearing on the petitioner's claim of ineffective assistance of trial counsel for counsel's failure to introduce DNA evidence that would have conclusively shown that his blood was not found at the scene of the crime. It is counsel's representation at trial, with the knowledge that counsel would have had at trial, that the petitioner challenges. His contention is that trial counsel failed to inform the jury that the results of the DNA collected from the blood in the victim's home conclusively established that the blood was not his. In support, the petitioner attached the DNA report prepared prior to trial. Accordingly, any new DNA evidence regarding what, if anything, was found on the mirror, which had no blood on it, has no impact on the petitioner's claim.

¶ 65    More importantly, contrary to the State's position on appeal, our supreme court has repeatedly held that when a petitioner has been deprived of his right to reasonable assistance of postconviction counsel, he need not establish any further prejudice, and courts of appeal must remand for further proceedings without regard to the merits of the underlying claims. See *People v. Suarez*, 224 Ill. 2d at 47 ("This court has consistently held that remand is required where postconviction counsel failed to fulfill the duties of consultation, examining the record, and amendment of the *pro se* petition, *regardless of whether the claims raised in the petition had merit*.

[Citations]" (Emphasis added.)); *Turner*, 187 Ill. 2d at 416 ("This court will not speculate whether the trial court would have dismissed the petition without an evidentiary hearing if counsel had adequately performed his duties under Rule 651(c)."); *Johnson*, 154 Ill. 2d at 246 ("We cannot simply presume *** that the trial court would have dismissed the petition without an evidentiary hearing if counsel had adequately performed his duties under Rule 651(c). It is the duty of the trial court *** to determine on the basis of a complete record whether the postconviction claims require an evidentiary hearing."). As our supreme court has explained its rationale:

"Our Rule 651(c) analysis has been driven, not by whether a particular defendant's claim is potentially meritorious, but by the conviction that where postconviction counsel does not adequately complete the duties mandated by the rule, the limited right to counsel conferred by the Act cannot be fully realized. See [*People v.*]*Brown*, 52 Ill. 2d [227,] 230 [(1972)], *** ('[T]he purpose underlying Rule 651(c) is not merely formal. It is to ensure that all indigents are provided proper representation when presenting claims of constitutional deprivation under the Post–Conviction Hearing Act. [Citation.] The fulfillment of this design would not be encouraged were we to ignore the rule's nonobservance in those cases appealed to this court'); *** We have [therefore] consistently declined the State's invitation to excuse noncompliance with the rule on the basis of harmless error." *Suarez*, 224 Ill. 2d at 51.

¶ 66    On appeal, the petitioner acknowledges that this rationale applies where postconviction counsel has not filed a Rule 651(c) certificate but that the issue of whether it applies when counsel does file such a certificate is currently pending before our supreme court. See *People v. Addison,* 2021 IL App (2d) 180540, *pet. for leave to appeal granted*, 447 Ill. Dec. 724 (2021); see also *Patton*, 2021 IL App (1st) 192148-U, ¶¶ 28-30 (holding that where postconviction counsel files a Rule 651(c) certificate, if the petitioner cannot establish that his underlying claims have merit, he

cannot overcome the presumption of reasonable assistance since counsel is required only to amend the petition where "necessary."). He, nonetheless, urges us to follow the line of cases that have applied this rationale regardless of the filing of a Rule 651(c) certificate. See *e.g.*, *Schlosser*, 2012 IL App (1st) 092523; *Addison,* 2021 IL App (2d) 180540; *People v. Milam*, 2012 IL App (1st) 100832, ¶¶ 36, 40; *People v. Kluppelberg*, 327 Ill. App. 3d 939, 947-48 (2002); see also *People v. Nitz*, 2011 IL App (2d) 100031, ¶ 18 ("a defendant is not required to make a positive showing that his counsel's failure to comply with Rule 651(c) caused prejudice); see also *People v. Russell*, 2016 IL App (3d) 140386, ¶ 12 ("where postconviction counsel failed to fulfill the duties of Rule 651(c), remand is required regardless of whether the claims raised in the petition had merit.").

¶ 67    We agree with the petitioner, and find that the rationale of *Suarez*, *Turner*, and *Johnson*, apply to the present circumstances. In that respect, we reiterate that our supreme court has "not *** suggest[ed] that an attorney's Rule 651(c) certificate is conclusive compliance and can never be rebutted." *Perkins*, 229 Ill. 2d at 52. Instead, it has made clear that the purpose of Rule 651(c) is not merely formal. *Suarez*, 224 Ill. 2d at 47.

¶ 68    As already explained above, in the present case, when postconviction counsel chose to stand on the petitioner's *pro se* petition certifying that no amendments were necessary, but later changed course and argued waiver during the hearing on the State' motion to dismiss the petition, he demonstrated his failure to comply with the requirements of Rule 651(c). See *Schlosser*, 2012 IL App (1st) 092523. Counsel's "failure to amend the postconviction petition precluded consideration of petitioner's claims on the merits and directly contributed to the dismissal of the petition without an evidentiary hearing." *Turner*, 187 Ill. 2d at 415. "In such situations, our supreme court has declared 'it is improper to affirm the dismissal of a postconviction petition ***.' " *Turner*, 187 Ill. 2d at 415-16. Accordingly, we must reverse the dismissal of the petition and

remand for further second-stage proceedings and the appointment of competent counsel. See *e.g.*, *Schlosser*, 2012 IL App (1st) 092523; see also *People v. Kirk*, 2012 IL App (1st) 101606, ¶ 36 (holding that appointed postconviction counsel rendered unreasonable assistance in violation of Rule 651(c) when he failed to amend the *pro se* petition to include the oral claim of ineffective assistance of appellate counsel claim that he asserted during the hearing on the State's motion to dismiss the petition.)

¶ 69 In coming to this decision, we express no opinion on the merits of the petitioner's underlying claim or whether an evidentiary hearing on his claim would be appropriate in this case. See *Johnson*, 154 Ill. 2d at 246 (holding that it is the duty of the trial court, not the reviewing court, to determine based on a complete record whether the postconviction claim requires an evidentiary hearing).

¶ 70

¶ 71                                  III. CONCLUSION

¶ 72 For the aforementioned reasons, we reverse the judgment of the circuit court dismissing the *pro se* petition and remand for further second-stage proceedings. On remand, we direct the circuit court to appoint new counsel and to allow the petitioner to replead his postconviction petition to assert a claim of ineffective assistance of appellate counsel. *Turner*, 187 Ill. 2d at 417.

¶ 73 Reversed and remanded with directions.